# EXHIBIT B

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This AMENDED AND RESTATED EMPLOYMENT AGREEMENT ("*Agreement*") is entered into as of June 5, 2015 (the "*Agreement Date*") between AWP, Inc., an Ohio corporation (the "*Company*"), and Robert R. Parrish ("*Executive*").

WHEREAS, the Company and Executive currently are parties to an Employment Agreement, effective as of November 5, 2009 (the "*Prior Agreement*"), and the Company and Executive desire to amend and restate the Prior Agreement;

WHEREAS, AWP Holding Company, a Delaware corporation, AWP Group Intermediate, Inc., a Delaware Corporation ("*Buyer*"), AWP Group Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of Buyer, and the Sellers Representative (as defined therein) and certain other parties thereto are entering into that certain Agreement and Plan of Merger, on the Agreement Date (the "*Merger Agreement*"); and

WHEREAS, this Agreement shall supersede and completely replace the Prior Agreement as of the Effective Date.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Certain Definitions.  Certain words or phrases used herein with initial capital letters shall have the meanings set forth in **Section 8** hereof.

2.      Employment.  The Company shall employ Executive, and Executive accepts employment with the Company as of the Effective Date, upon the terms and conditions set forth in this Agreement for the period beginning on the Effective Date and ending as provided in **Section 5** hereof (the "*Employment Period*").  Notwithstanding anything in this Agreement to the contrary, but subject to **Section 6** hereof, Executive will be an at-will employee of the Company and Executive or the Company may terminate Executive's employment with the Company for any reason or no reason at any time.

3.      Position and Duties.

(a)      During the Employment Period, Executive shall serve as the Vice President of Business Development of the Company and shall have the normal duties, responsibilities and authority of an executive serving in such position, subject to the power of the Board of Directors of the Company (the "*Board*") or the President and Chief Executive Officer of the Company (the "*CEO*") to expand or limit such duties, responsibilities and authority, either generally or in specific instances.

(b)      During the Employment Period, Executive shall report to the CEO.

(c)      During the Employment Period, Executive shall devote Executive's best efforts and Executive's full business time and attention (except for (i) permitted vacation

Employment Agreement – Robert R. Parrish

periods and reasonable periods of illness or other incapacity and (ii) Executive's participation in a reasonable level of (A) non-profit, civic and charitable activities, and (B) personal investment and real estate management) to the business and affairs of the Company, its subsidiaries and affiliates. Executive shall perform Executive's duties and responsibilities to the best of Executive's abilities in a diligent, trustworthy, businesslike and efficient manner.

4.      Compensation and Benefits.

        (a)     Salary.    The Company shall pay Executive a salary during the Employment Period in installments based on the Company's practices as may be in effect from time to time, but in no event less frequently than semi-monthly.  Executive's initial salary is at the rate of $135,000 per year (the "*Base Salary*").  The Board shall review Executive's Base Salary from time to time (but in no event less frequently than annually) and may, in its sole discretion, increase it.

        (b)     Annual Bonus.  During the Employment Period, Executive will be eligible for an annual bonus of up to 50% of Executive's Base Salary (the "*Annual Bonus*"), based on the achievement of specified performance goals (as reasonably determined by the Board).  Each year, a bonus plan will be prepared by the CEO and submitted to the Board for approval, in conjunction with the annual budget process.  Any bonus earned pursuant to this **Section 4(b)** shall be paid to Executive as soon as practicable following the receipt and review by the Company of audited financial statements for the fiscal year to which the annual bonus relates, but in any event in the calendar year following the calendar year in which such bonus was earned.

        (c)     Standard Benefits Package.    Executive shall be entitled during the Employment Period to participate, on the same basis as other employees of the Company, in the Company's Standard Benefits Package.   The Company's "*Standard Benefits Package*" means those benefits (including hospitalization and medical plans or insurance coverage, retirement plans, vacation and holidays (as more fully described in **Section 4(d)**) and other benefits, but excluding, except as hereinafter provided in **Sections 6(b)**, **(c)** and **(d)**, any severance pay program or policy of the Company) for which the employees of the Company are from time to time generally eligible, as determined from time to time by the Board.

        (d)     Vacations and Holidays.  Executive will be entitled to four (4) weeks of paid vacation each calendar year during the Employment Period.  Such vacation shall be taken in accordance with the vacation policies of the Company in effect for its key management employees from time to time.  Executive will also be entitled to the paid holidays as set forth in the Company's holiday and vacation policy.

        (e)     Automobile.  During the Employment Period, the Company shall provide Executive with either:

                (i)      the use of an automobile plus expense reimbursement for Executive's reasonable costs of insurance, gas, and maintenance with respect to

Employment Agreement – Robert R. Parrish

such automobile, <u>provided</u>, <u>however</u>, that such expenses must be paid no later than the last day of the calendar year following the calendar year in which such expenses were incurred and <u>further</u> <u>provided</u> that in no event will the amount of expenses reimbursed or benefits provided in one taxable year affect the amount of expenses eligible for reimbursement or benefits provided in any other taxable year; or

(ii)    an allowance of up to $500.00 per month for Executive's automobile expenses, payable on the first payroll date of each month.

(f)    <u>Cell Phone</u>.  During the Employment Period, the Company shall provide Executive with the use of a cell phone; <u>provided</u> that in no event will the benefits provided in one taxable year affect the benefits provided in any other taxable year.

(g)    <u>Indemnification</u>.  With respect to Executive's acts or failures to act during the Employment Period in Executive's capacity as a director, officer, employee or agent of the Company, Executive will be entitled to liability insurance coverage on the same basis as other directors and officers of the Company.

5.    <u>Employment Period</u>.

(a)    Except as hereinafter provided, the Employment Period shall continue until, and shall end upon, the first anniversary of the Effective Date.

(b)    On the first anniversary of the Effective Date and on each anniversary thereafter, unless the Employment Period shall have ended pursuant to subparagraph 5(c) below or either party shall have given written notice to the other party at least three (3) months prior written notice that the Employment Period will not be extended, the Employment Period shall be extended for an additional year.

(c)    Notwithstanding (a) or (b) above, the Employment Period shall end early upon the first to occur of any of the following events

(i)    Executive's death;

(ii)    the Company's termination of Executive's employment due to Permanent Disability;

(iii)    a Termination For Cause;

(iv)    a Termination Without Cause;

(v)    a Voluntary Termination Without Good Reason; or

(vi)    a Voluntary Termination With Good Reason.

Employment Agreement – Robert R. Parrish

6.      Post-Employment Payments.

(a)      At the end of Executive's employment for any reason, Executive will cease to have any rights to salary, Annual Bonus, equity awards, expense reimbursements or other benefits, except that Executive will be entitled to (i) any Base Salary that has accrued but is unpaid, any reimbursable expenses that have been incurred but are unpaid, and any unexpired vacation days that have accrued under the Company's vacation policy but are unused, as of the end of the Employment Period, (ii) any option rights or plan benefits that by their terms extend beyond termination of Executive's employment (but only to the extent provided in any option theretofore granted to Executive or any other benefit plan in which Executive has participated as an employee of the Company and excluding, except as hereinafter provided in **Sections 6(b)**, **(c)** and **(d)**, any severance pay program or policy of the Company) and (iii) any benefits to which Executive is entitled under Part 6 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended ("*COBRA*").  In addition, Executive will be entitled to the additional benefits and amounts described in **Sections 6(b)**, **(c)** and **(d)**, in the circumstances described in such subparagraphs.

(b)      If the Employment Period ends pursuant to **Section 5** on account of (i) Executive's death or (ii) the Company's termination of Executive's employment due to Permanent Disability, the Company shall pay Executive (or his designated beneficiary in the event of his death) (x) an amount equal to thirty (30) days of his Base Salary at the time of such termination in a single lump sum, payable in accordance with **Section 6(e)** and (y) the *pro rata* amount of the Annual Bonus, if any, to which Executive would have been entitled if his employment had not terminated prior to the end of the fiscal year in which the termination due to Executive's death or Permanent Disability occurred.  Such *pro rata* Annual Bonus shall be determined by multiplying the full Annual Bonus Executive would have been entitled to if his employment had not terminated prior to the end of such fiscal year by a fraction, the numerator of which is the number of days Executive was employed by the Company in the fiscal year in which his termination of employment or death occurred and the denominator of which is 365.  Such pro rata Annual Bonus shall be paid as soon as practicable following the receipt and review by the Company of audited financial statements for the fiscal year to which the annual bonus relates, but in any event in the calendar year following the calendar year in which such bonus was earned.

(c)      If the Employment Period ends pursuant to **Section 5** on account of a Termination Without Cause or a Voluntary Termination With Good Reason, the Company shall (i) continue to pay Executive his Base Salary at the time of such termination for a period of nine (9) months following such termination in accordance with the Company's normal payroll practices and (ii) pay Executive the *pro rata* amount of the Annual Bonus, if any, to which Executive would have been entitled if his employment had not terminated prior to the end of the fiscal year in which such Termination Without Cause or Voluntary Termination With Good Reason occurred.  Such pro rata Annual Bonus shall be determined by multiplying the full Annual Bonus Executive would have been entitled to if his employment had not terminated prior to the end of such fiscal year by a fraction, the numerator of which is the number of days

Employment Agreement – Robert R. Parrish

Executive was employed by the Company in the fiscal year in which his termination of employment occurred and the denominator of which is 365.  Such pro rata Annual Bonus shall be paid as soon as practicable following the receipt and review by the Company of audited financial statements for the fiscal year to which the annual bonus relates, but in any event in the calendar year following the calendar year in which such bonus was earned.  It is expressly understood that the Company's payment obligations under this **Section 6(c)** will cease if Executive breaches any of the agreements in **Section 7** hereof.

(d)     In addition, if the Employment Period ends pursuant to **Section 5** on account of a Termination Without Cause or a Voluntary Termination With Good Reason, Executive (and his spouse and dependents) will be entitled to continue to participate in the Company's medical plan (with a monthly premium cost to Executive equal to the amount active key employees, who have elected the same coverage level as Executive, are required to pay as a monthly premium for participation in such plan, which amount will be withheld by the Company from the payments made to Executive described in preceding sentence pursuant to the Company's cafeteria plan, if applicable) until the earlier of (i) Executive's eligibility for any such coverage on substantially similar terms and without applicable pre-existing condition exclusions under another employer's or any other medical plan or (ii) six (6) months following the termination of Executive's employment.  Executive agrees that the period of coverage under such plan will constitute and count against such plan's obligation to provide continuation coverage pursuant to COBRA.  It is expressly understood that the Company's payment obligations and Executive's participation rights under this **Section 6(d)** will cease if Executive breaches any of the agreements in **Section 7** hereof.

(e)     Release.  Notwithstanding anything herein to the contrary, the Company is not obligated to make any payment or provide any benefit under **Sections 6(b)**, **(c)** or **(d)** hereof unless (i) prior to the 60th day following the Termination Without Cause, Voluntary Termination With Good Reason or termination due to Executive's Permanent Disability or death, Executive (or his estate) executes a release of all current or future claims, known or unknown, arising on or before the date of the release against the Company and its subsidiaries and the directors, officers, employees and affiliates of any of them in in a form approved by the Company, (ii) any applicable revocation period has expired during such 60-day period without Executive (or his estate) revoking such release, and (iii) Executive resigns from any and all positions, including, without limitation, as a director, trustee, and officer that Executive holds with the Company and any subsidiary or affiliate of the Company. The amounts payable pursuant to **Section 6(b)** and **Section 6(c)** shall be reduced by the amount of any compensation earned or received by Executive in connection with the performance of any services to a third party by Executive during the nine months' period of payment pursuant to **Section 6(c)(i)**.

(f)     Each payment under **Sections 6(b)**, **(c)** or **(d)** hereof shall be considered a separate payment and not one of a series of payments for purposes of Section 409A of the Internal Revenue Code of 1986, as amended ("*Section 409A of the Code*").  Any amount due pursuant to **Sections 6(b)**, **(c)** or **(d)** during the sixty (60) day period following Executive's Termination Without Cause, Voluntary Termination With Good Reason or

termination due to Executive's Permanent Disability or death shall be paid to Executive in a single lump sum on the first payroll date after such sixty (60) day period.

7.       Competitive Activity; Confidentiality; Nonsolicitation.

(a)       Acknowledgements and Agreements.  Executive hereby acknowledges and agrees that in the performance of Executive's duties to the Company during the Employment Period, Executive will be brought into frequent contact either in person, by telephone or through the mails, with existing and prospective customers of the Company throughout the world.  Executive also agrees that trade secrets and other confidential information of the Company, more fully described in **Section 7(d)(i)**, gained by Executive during Executive's association with the Company, have been developed by the Company through substantial expenditures of time, effort and money and constitute valuable and unique property of the Company.  Executive further understands and agrees that the foregoing makes it necessary for the protection of the Company's Business that Executive not compete with the Company during his employment with the Company and not compete with the Company for a reasonable period thereafter, as further provided in the following subparagraphs.

(b)       Covenants.

(i)       Covenants During Employment.  While employed by the Company, Executive shall not compete with the Company anywhere in the world. In accordance with this restriction, but without limiting its terms, while employed by the Company, Executive shall not:

(A)       enter into or engage in any business which competes with the Company's Business;

(B)       solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Company's Business;

(C)       divert, entice or otherwise take away any customers, business, patronage or orders of the Company or attempt to do so; or

(D)       promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business.

(ii)       Covenants Following Termination.  For a period of two (2) years following the termination of Executive's employment, Executive shall not:

(A)       enter into or engage in any business which competes with the Company's Business within the Restricted Territory (as defined in **Section 8**);

6                        Employment Agreement – Robert R. Parrish

(B)    solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;

(C)    divert, entice or otherwise take away any customers, business, patronage or orders of the Company within the Restricted Territory, or attempt to do so; or

(D)    promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(iii)    Indirect Competition.  For the purposes of **Sections 7(b)(i)** and **(ii)** inclusive, but without limitation thereof, Executive will be in violation thereof if Executive engages in any or all of the activities set forth therein directly as an individual on Executive's own account, or indirectly as a partner, joint venturer, employee, agent, salesperson, consultant, officer and/or director of any firm, association, partnership, corporation or other entity or as a stockholder of any corporation in which Executive or Executive's spouse, child or parent owns, directly or indirectly, individually or in the aggregate, more than one percent (1%) of the outstanding stock.

(iv)    If it is judicially determined that Executive has violated this **Section 7(b)**, then the period applicable to each obligation that Executive is determined to have violated will automatically be extended by a period of time equal in length to the period during which such violation(s) occurred.

(c)    Non-Solicitation.  Executive shall not directly or indirectly at any time during the period of Executive's employment or for two (2) years thereafter, hire or solicit any of the Company's employees, consultants, agents, representatives or vendors to resign from their employment or terminate their relationship with the Company or interfere with any such relationship; provided, that it is not a violation of this **Section 7(c)** if one of the Company's employees, consultants, agents or representatives responds to an advertisement of a general "help wanted" or "seeking to hire" nature independently of any solicitation by the Executive.

(d)    Further Covenants.

(i)    Executive shall keep in strict confidence, and shall not, directly or indirectly, at any time, during or after Executive's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Executive's duties of employment or as required by law or compelled by any governmental authority, use any trade secrets or confidential business and technical information of (x) the Company or (y) its customers or vendors that the Company has agreed to keep confidential pursuant to a

7                              Employment Agreement – Robert R. Parrish

confidentiality agreement, in each case without limitation as to when or how Executive may have acquired such information.  Such confidential information includes, without limitation, the Company's unique purchasing, selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, supplier pricing arrangements and pricing of specific materials, other customer and prospective customer information and other business information.  Executive specifically acknowledges that all such confidential information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Executive and whether compiled by the Company, and/or Executive, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Company to maintain the secrecy of such information, that such information is the sole property of the Company and that any retention and use of such information by Executive during Executive's employment with the Company (except in the course of performing Executive's duties and obligations to the Company) or after the termination of Executive's employment constitutes a misappropriation of the Company's trade secrets.  Notwithstanding the foregoing, such confidential information shall not include information that is or becomes generally available to or known by the public, other than as a result of a disclosure by Executive, or that is or becomes available to Executive on a nonconfidential basis prior to its disclosure to Executive by the Company (provided that the source of such information is not known by Executive to be bound by a confidentiality agreement with the Company).

(ii)     Executive agrees that upon termination of Executive's employment with the Company, for any reason, Executive shall return to the Company in good condition, all property of the Company, including without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any items of information listed in **Section 7(d)(i)** of this Agreement. In the event that such items are not so returned, the Company will have the right to charge Executive for all reasonable damages, costs, attorneys' fees and other expenses incurred in searching for, taking, removing and/or recovering such property.

(e)     Discoveries and Inventions; Work Made for Hire.

(i)     Executive agrees that upon conception and/or development of any idea, discovery, invention, improvement, software, writing or other material or design that:  (A) relates to the business of the Company, or (B) relates to the Company's actual or demonstrably anticipated research or development, or (C) results from any work performed by Executive for the Company, Executive shall assign to the Company the entire right, title and interest in and to any such idea, discovery, invention, improvement, software, writing or other material or design.  Executive has no obligation to assign any idea, discovery, invention,

8                    Employment Agreement – Robert R. Parrish

improvement, software, writing or other material or design that Executive conceives and/or develops entirely on Executive's own time without using the Company's equipment, supplies, facilities, or trade secret information unless the idea, discovery, invention, improvement, software, writing or other material or design either:  (x) relates to the business of the Company, or (y) relates to the Company's actual or demonstrably anticipated research or development, or (z) results from any work performed by Executive for the Company.  Executive agrees that any idea, discovery, invention, improvement, software, writing or other material or design that relates to the business of the Company or relates to the Company's actual or demonstrably anticipated research or development that is conceived or suggested by Executive, either solely or jointly with others, within one (1) year following termination of Executive's employment under this Agreement or any successor agreements will be presumed to have been so made, conceived or suggested in the course of such employment with the use of the Company's equipment, supplies, facilities, and/or trade secrets.

(ii)      In order to determine the rights of Executive and the Company in any idea, discovery, invention, improvement, software, writing or other material, and to insure the protection of the same, Executive agrees that during Executive's employment, and for one (1) year after termination of Executive's employment under this Agreement or any successor agreements Executive shall disclose immediately and fully to the Company any idea, discovery, invention, improvement, software, writing or other material or design conceived, made or developed by Executive solely or jointly with others.  The Company agrees to keep any such disclosures confidential.  Executive also agrees to record descriptions of all work in the manner directed by the Company and agrees that all such records and copies, samples and experimental materials will be the exclusive property of the Company.  Executive agrees that at the request of and without charge to the Company, but at the Company's expense, Executive shall execute a written assignment of the idea, discovery, invention, improvement, software, writing or other material or design to the Company and shall assign to the Company any application for letters patent or for trademark registration made thereon, and to any common-law or statutory copyright therein; and that Executive will do whatever may be necessary or desirable to enable the Company to secure any patent, trademark, copyright, or other property right therein in the United States and in any foreign country, and any division, renewal, continuation, or continuation in part thereof, or for any reissue of any patent issued thereon.  In the event the Company is unable, after reasonable effort, and in any event after ten business days, to secure Executive's signature on a written assignment to the Company of any application for letters patent or to any common-law or statutory copyright or other property right therein, whether because of Executive's physical or mental incapacity or for any other reason whatsoever, Executive irrevocably designates and appoints the Corporate Secretary of the Company as Executive's attorney-in-fact to act on Executive's behalf to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of such letters patent, copyright or trademark.

Employment Agreement – Robert R. Parrish

(iii)    Executive acknowledges that, to the extent permitted by law, all work papers, reports, documentation, drawings, photographs, negatives, tapes and masters therefor, prototypes and other materials (hereinafter, "*items*"), including without limitation, any and all such items generated and maintained on any form of electronic media, generated by Executive during Executive's employment with the Company will be considered a "work made for hire" and that ownership of any and all copyrights in any and all such items belong to the Company.  The item will recognize the Company as the copyright owner, will contain all proper copyright notices, e.g., "(creation date) AWP, Inc. All Rights Reserved," and will be in condition to be registered or otherwise placed in compliance with registration or other statutory requirements throughout the world.

(f)    <u>Cooperation</u>. Upon the receipt of reasonable notice from the Company (including outside counsel), Executive agrees that while employed by the Company and thereafter, Executive will respond and provide information with regard to matters in which Executive has knowledge as a result of Executive's employment with the Company, and will provide reasonable assistance to the Company, its affiliates and their respective representatives in defense of any claims that may be made against the Company or its affiliates, and will assist the Company and its affiliates in the prosecution of any claims that may be made by the Company or its affiliates, to the extent that such claims may relate to the period of Executive's employment with the Company (collectively, the "*Claims*"). Executive agrees to promptly inform the Company if Executive becomes aware of any lawsuits involving Claims that may be filed or threatened against the Company or its affiliates. Executive also agrees to promptly inform the Company (to the extent that Executive is legally permitted to do so) if Executive is asked to assist in any investigation of the Company or its affiliates (or their actions) or another party attempts to obtain information or documents from Executive (other than in connection with any litigation or other proceeding in which Executive is a party-in-opposition) with respect to matters Executive believes in good faith to relate to any investigation of the Company or its affiliates, in each case, regardless of whether a lawsuit or other proceeding has then been filed against the Company or its affiliates with respect to such investigation, and shall not do so unless legally required. During the pendency of any litigation or other proceeding involving Claims, Executive shall not communicate with anyone (other than Executive's attorneys and tax and/or financial advisors and except to the extent that Executive determines in good faith is necessary in connection with the performance of Executive's duties hereunder) with respect to the facts or subject matter of any pending or potential litigation or regulatory or administrative proceeding involving the Company or any of its affiliates without giving prior written notice to the Company or the Company's counsel. Upon presentation of appropriate documentation, the Company shall pay or reimburse Executive for all reasonable out-of-pocket travel, duplicating or telephonic expenses incurred by Executive in complying with this subparagraph 7(f).

(g)    <u>Communication of Contents of Agreement</u>.  While employed by the Company and for two (2) years thereafter, Executive shall communicate the contents of **Section 7** of this Agreement to any person, firm, association, partnership, corporation or other entity that Executive intends to be employed by, associated with, or represent.

10

(h)     Confidentiality Agreements.  Executive shall not disclose to the Company or induce the Company to use any secret or confidential information belonging to Executive's former employers.  Except as indicated, Executive warrants that Executive is not bound by the terms of a confidentiality agreement or other agreement with a third party that would preclude or limit Executive's right to work for the Company and/or to disclose to the Company any ideas, inventions, discoveries, improvements or designs or other information that may be conceived during employment with the Company.  Executive shall provide the Company with a copy of any and all agreements with a third party that preclude or limit Executive's right to make disclosures or to engage in any other activities contemplated by Executive's employment with the Company.

(i)     Nondisparagement.

(i)     Executive agrees that he shall not communicate to any third parties in a malicious, disparaging or defamatory manner regarding the Company or any of its subsidiaries or parents.  Further, Executive shall not make or cause to be made any written or oral statement that may disparage or damage the reputation of the Company or any of its subsidiaries or parents.

(ii)     The Company agrees that it shall use its reasonable efforts to cause the individual members of the Board not to communicate to any third parties in a malicious, disparaging or defamatory manner regarding Executive.  Further, the Company shall use its reasonable efforts to cause the individual members of the Board not to make or cause to be made any written or oral statement that may disparage or damage the reputation of Executive.

(j)     Corporate Opportunity.  During the Employment Period, Executive shall submit to the Company all business, commercial and investment opportunities or offers presented to Executive or of which Executive becomes aware which relate to the business of the Company at any time during the Employment Period ("*Corporate Opportunities*").  Unless approved by the Company, Executive shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Executive's own behalf.

(k)     Relief.  Executive acknowledges and agrees that the remedy at law available to the Company for breach of any of Executive's obligations under this Agreement would be inadequate.  Executive therefore agrees that, in addition to any other rights or remedies that the Company may have at law or in equity, the Company may seek temporary and permanent injunctive relief in any proceeding that may be brought to enforce any provision contained in **Sections 7(b)**, **7(c)**, **7(d)**, **7(e)** and **7(h)**  inclusive, of this Agreement, without the necessity of proof of actual damage.

(l)     Reasonableness.  Executive acknowledges that Executive's obligations under this **Section 7** are reasonable in the context of the nature of the Company's Business and the competitive injuries likely to be sustained by the Company if Executive were to violate such obligations.  Executive further acknowledges that this Agreement is made in consideration of, and is adequately supported by the agreement of the Company

Employment Agreement – Robert R. Parrish

KE 36238901

to perform its obligations under this Agreement and by other consideration, which Executive acknowledges constitutes good, valuable and sufficient consideration.

(m)     The Company. For purposes of this **Section 7**, the Company shall include any and all direct and indirect subsidiary, parent, affiliated, or related companies of the Company for which Executive worked or had responsibility at the time of termination of his employment and at any time during the two (2) year period prior to such termination.

8.     Definitions.

(a)     "*Company's Business*" means the business of (a) surrounding and/or supporting the erection and maintenance of temporary traffic work zones, including flagging operations, lane closures, detour routes, traffic control drawings and installation and removal of signs, and (b) providing traffic control products for rental and sale.

(b)     "*Effective Date*" means the Closing Date, as defined in the Merger Agreement.

(c)     "*Permanent Disability*" means that Executive, because of accident, disability, or physical or mental illness, is incapable of performing Executive's duties to the Company or any subsidiary, as reasonably determined by the Board.  Notwithstanding the foregoing, Executive will be deemed to have become incapable of performing Executive's duties to the Company or any subsidiary, if Executive is incapable of so doing for (i) a continuous period of 90 days and remains so incapable at the end of such 90 day period or (ii) periods amounting in the aggregate to 180 days within any one period of 365 days and remains so incapable at the end of such aggregate period of 180 days.

(d)     "*Restricted Territory*" means the geographic area within the United States.

(e)     "*Termination For Cause*" means the termination by the Company or any subsidiary of Executive's employment with the Company or any subsidiary as a result of (i) the commission by Executive of a felony (other than one arising from traffic-related offenses, driving while intoxicated or similar offenses) or fraud, (ii) gross negligence or gross, intentional or willful misconduct by Executive with respect to the Company, (iii) Executive's abandonment of Executive's employment with the Company which is not cured within five business days after written notice thereof to Executive, (iv) Executive's insubordination or failure to follow the directions of the Board or the CEO (provided that such directions would not cause Executive to violate any law), which is not cured within five business days after written notice thereof to Executive, (v) Executive's violation of **Section 7** of this Agreement, (vi) Executive's breach of a material written employment policy of the Company, which is not cured within five business days after written notice thereof to Executive, or (vii) a material breach by Executive of this Agreement which is not cured within thirty days after written notice thereof to Executive.

Employment Agreement – Robert R. Parrish

(f)     "*Termination Without Cause*" means the termination by the Company or any subsidiary of Executive's employment with the Company or any subsidiary for any reason other than a termination for Permanent Disability or a Termination for Cause.

(g)     "*Voluntary Termination With Good Reason*" means Executive's termination of Executive's employment with the Company or any subsidiary as a result of the following conditions within 61 days of their initial occurrence without cure and without Executive's written consent (i) a requirement that Executive change his permanent place of employment to a location more than fifty (50) miles away from Smyrna, Georgia, (ii) a material diminution of Executive's responsibilities or duties as of the Effective Date which results in Executive having responsibilities and duties not consistent with a management employee (other than a temporary diminution by the Company or a subsidiary because of temporary illness or disability), or (iii) any other material breach by the Company of Sections 4(a)-(d) of this Agreement, in the case of each condition, which is not cured within thirty (30) days after written notice thereof to the Company provided within thirty (30) days of a condition's initial occurrence.

(h)     "*Voluntary Termination Without Good Reason*" means Executive's termination of Executive's employment with the Company or any subsidiary for any reason other than a Voluntary Termination With Good Reason.

9.     Survival.   Subject to any limits on applicability contained therein, **Section 7** hereof will survive and continue in full force in accordance with its terms notwithstanding any termination of the Employment Period.

10.     Taxes.   The Company may withhold from any amounts payable under this Agreement all federal, state, city or other taxes as the Company is required to withhold pursuant to any applicable law, regulation or ruling.   Notwithstanding any other provision of this Agreement, the Company is not obligated to guarantee any particular tax result for Executive with respect to any payment provided to Executive hereunder, and Executive shall be responsible for any taxes imposed on Executive with respect to any such payment.

11.     Notices.   Any notice provided for in this Agreement must be in writing and must be either personally delivered, sent by reputable overnight carrier or mailed by first class mail, return receipt requested, to the recipient at the address below indicated:

Notices to Executive:

Robert R. Parrish

_____

_____


Notices to the Company:

AWP, Inc.

KE 36238901

c/o The Riverside Company
45 Rockefeller Center
630 5th Avenue, Suite 400
New York, New York 10111
Attention:  Chief Financial Officer
Fax:  (212) 265-6478

and

c/o The Riverside Company
Terminal Tower
50 Public Square, 29th Floor
Cleveland, Ohio 44113
Attention: Christopher K. Jones
Email: cjones@riversidecompany.com

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement will be deemed to have been given when so delivered.

12.     Severability.   Whenever possible, each provision of this Agreement is to be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid or unenforceable in any respect under any applicable law, such invalidity or unenforceability will not affect any other provision, but this Agreement shall be reformed, construed and enforced as if such invalid or unenforceable provision had never been contained herein.

13.     Complete Agreement.   This Agreement embodies the complete agreement and understanding between the parties with respect to the subject matter hereof and effective as of its date supersedes and preempts any prior understandings, agreements or representations by or between the parties, written or oral, that may have related to the subject matter hereof in any way (including, without limitation, the Prior Agreement); provided that the covenants contained in **Section 7** are independent of, supplemental to, and do not modify, supersede or restrict (and shall not be modified, superseded or restricted by) any non-competition, non-solicitation, non-disparagement, confidentiality or other restrictive covenant in any other prior, current or future agreement unless reference is made to the specific provisions hereof that are intended to be modified, superseded or restricted.

14.     Counterparts.   This Agreement may be executed in separate counterparts, each of which will be deemed to be an original and both of which taken together will constitute one and the same agreement.

15.     Successors and Assigns.   This Agreement binds and inures to the benefit of and is enforceable by Executive, the Company and their respective heirs, executors, personal representatives, successors and assigns, except that neither party may assign any rights or delegate any obligations hereunder without the prior written consent of the other party. Executive hereby consents to the assignment by the Company of all of its rights and obligations hereunder

14

KE 36238901

to any successor to the Company by merger or consolidation or purchase of all or substantially all of the Company's assets, provided such transferee or successor assumes the liabilities of the Company hereunder.

16.    Effectiveness. Notwithstanding anything herein to the contrary, the effectiveness of this Agreement is expressly contingent upon the consummation of the Closing (as defined in the Merger Agreement), and prior to such Closing, the Prior Agreement shall remain in effect. In the event the Merger Agreement is terminated prior to such Closing, this Agreement shall terminate, and the Prior Agreement shall remain effective in accordance with its terms.

17.    Choice of Law.  This Agreement is to be governed by, and construed in accordance with, the internal, substantive laws of the State of Georgia.  Executive agrees that the state and federal courts located in the State of Georgia will have jurisdiction in any action, suit or proceeding against Executive based on or arising out of this Agreement and Executive hereby: (a) submits to the personal jurisdiction of such courts; (b) consents to service of process in connection with any action, suit or proceeding against Executive; and (c) waives any other requirement (whether imposed by statute, rule of court or otherwise) with respect to personal jurisdiction, venue or service of process.

18.    Amendment and Waiver.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement will affect the validity, binding effect or enforceability of this Agreement.

19.    Compliance with Section 409A of the Code.  To the extent applicable, it is intended that this Agreement comply with, or be exempt from, the provisions of Section 409A of the Code, so that the income inclusion provisions of Section 409A(a)(1) do not apply to Executive.  This Agreement shall be administered in a manner consistent with this intent. Notwithstanding the foregoing, the Company shall not be obligated to guarantee any particular tax result for Executive with respect to any income recognized by Executive in connection herewith, and Executive shall be responsible for any taxes imposed on Executive in connection with this Agreement.

[SIGNATURES ON FOLLOWING PAGE]

Employment Agreement – Robert R. Parrish

KE 36238901

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

AWP, INC.

By: _____

Name: John Sypek
Title: President and CEO

Signature Page to Employment Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

_____
Robert R. Parrish

Signature Page to Employment Agreement